Karra J. Porter, #5223
    Karra.Porter@chrisjen.com
M. Tanner Clagett, #15823
    Tanner.Clagett@chrisjen.com
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 323-5000
Facsimile:  (801) 355-3472
*Attorney for Plaintiffs Toren Beales,*
*Carli Brady and Michael Srygler*

**IN THE UNITED STATES DISTRICT COURT,
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **TOREN BEALES,** individually and as natural guardian of **P.B.,** a minor; **CARLI BRADY**; and **MICHAEL SRYGLER,**<br><br>                 Plaintiffs,<br><br>v.<br><br>**THOMAS DUFFIELD**; in his individual capacity; and **LEHI CITY,**<br><br>                 Defendants. | **COMPLAINT**<br><br>**AND JURY DEMAND**<br><br>Civil No.<br><br>District Judge. |

Plaintiffs Toren Beales, individually and as natural guardian of P.B., Carli Brady and Michael Srygler, by and through undersigned counsel of record, hereby complain against Defendants as alleged below.

### PRELIMINARY STATEMENT AND INTRODUCTION

On April 2, 2023, Toren Beales was peaceably driving his vehicle along 2100 North in Lehi, Utah. He and two friends, Michael Srygler and Carli Brady, along with his six-year-old son, P.B., were driving home from a Sunday lunch when they were unexpectedly stopped by multiple Lehi City police vehicles flashing lights and sirens. After pulling over, Toren saw in his

rear review mirror several Lehi officers taking positions behind police vehicles pointing guns at his car. Police initiated the "high-risk" "felony stop" at the request of Lehi City officer Thomas Duffield. Duffield had received an alert from the National Crime Information Center that the Vehicle Identification Number (VIN) of Toren's car was a "partial" match to the VIN of a stolen vehicle. According to the NCIC alert, the stolen car was a black Acura Integra hatchback with Washington plates. Toren's car was a green Honda Civic sedan with Utah plates. Despite the obvious mismatch – and an express warning by the NCIC to confirm the details of the vehicle before taking action – Duffield called for backup and more than half a dozen Lehi officers subjected Toren, his son, and his passengers to a traumatic series of events. The officers shouted aggressively, ordering them out of the car. Their phones were taken. They were held at gunpoint, handcuffed, and locked in separate police vehicles while officers ignored proof that the vehicle was not stolen. After being left alone, terrified, P.B. was removed from the car and sobbed as his handcuffed father tried to comfort him. Eventually other officers realized what Duffield already knew – that it was only a partial VIN match and the vehicle descriptions were completely different – and directed that the Plaintiffs be released. As described further below, Duffield's actions violated Plaintiffs' constitutional rights and resulted in this legal action.

## PARTIES

1. Plaintiff Toren Beales ("Toren" or "Plaintiff"), individually and as parent and natural guardian of P.B., is an individual who, at all times relevant to this complaint, resided in Utah County, Utah.

2. Plaintiff Carli Brady ("Carli" or "Plaintiff") is an individual who, at all times relevant to this complaint, resided in Utah County, Utah.

3. Plaintiff Michael Srygler ("Michael" or "Plaintiff") is an individual who, at all times relevant to this complaint, resided in Utah County, Utah.

4. Defendant Lehi City ("Lehi") is a political subdivision located in Utah County, State of Utah.

5. Defendant Thomas Duffield is—or was at the time of the incidents described herein—a law enforcement officer employed by Defendant Lehi City.

## JURISDICTION AND VENUE

6. This action raises questions under the Constitution of the United States and 42 U.S.C. § 1983, and thus this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

7. Venue is proper in this Court under 28 U.S.C. §§ 1391(a) and 1391(b)(2), as the events or omissions alleged occurred in Utah County, Utah.

## FACTUAL BACKGROUND

### *The Traffic Stop*

8. On Sunday, April 2, 2023, at approximately 2:40 p.m., Plaintiff Toren Beales was driving along 2100 North in Utah County in his 1998 Honda Civic.

9. Also in his vehicle were his six-year-old son, P.B., as well as Michael Srygler and Carli Brady.

10. The group was returning to Toren's house from lunch together.

11. At approximately 2:40 p.m., Toren noticed multiple police vehicles behind him with lights flashing.

12. Upon information and belief, one of two things happened that initiated the traffic stop:

a. Duffield manually ran a license plate check on Toren's car. Facts supporting this alternative include Duffield's report, which states that he "ran" Toren's license plate, and a statement by Lehi Police Chief Darren Paul stating that Duffield "r[an] a license plate on a vehicle they were following." Alternatively,

b. An Automatic License Plate Reader (ALPR) scanned Toren's license plate. Facts supporting this alternative include that Lehi employs the use of ALPRs, Duffield had no reason to run Toren's license plate, and the City of Lehi made certain unexplained redactions when providing the police reports in response to a Government Records Access and Management Act (GRAMA) request.

13. Toren was not speeding or violating other traffic laws.

14. Regardless of whether the license plate was run manually or by ALPR, it generated a notice from the National Crime Information Center (NCIC). The NCIC notice appeared on the open screen of Duffield's laptop. The content of the screen was visible to Duffield. Upon information and belief, the salient points of the notice were also verbally announced to Duffield.

15. The NCIC notice included this warning with large, white letters on a red background ("Stolen Vehicle – Partial VIN – Verify"):



16. The NCIC notice stated that the car for which it was issued was:

a. a black

b.  Acura Integra

c.  with Washington license plates

17. Duffield was aware that he was following a green Honda Civic with Utah license plates.

18. Duffield called dispatch and stated the license plate number.  He did not tell dispatch during this call that he was following a green Honda Civic.  Based on the incomplete information provided by Duffield, dispatch stated that the plate "does come back 1099 [stolen]".

19. Duffield decided to initiate a "high risk" stop of the vehicle.

20. While Duffield was ordering passengers out of the vehicle, the dispatcher stated that the plates "run to a green Honda Civic.  Per the NCIC hit, it should be on a black Acura." The dispatcher was reading from the same NCIC notice that Duffield had received earlier.

21. Before stopping Toren's vehicle, Duffield knew that the hit was a "partial VIN match," meaning that *some* of the numbers in the 17-digit Vehicle Identification Number (VIN) of the Honda Civic matched *some* of the numbers of a stolen car.

22. Duffield did not tell dispatch that the hit to which he was responding was a partial VIN match.

23. Before stopping Toren's vehicle, Duffield knew that he was supposed to "verify" that the vehicle at issue was the same vehicle identified in the NCIC alert. Before pulling over the Plaintiffs at gunpoint, Duffield did not verify that Toren's vehicle was the same vehicle for which the NCIC notice was issued.

24. In his report, Duffield falsely stated that the critical fact that the NCIC alert was for a "partial VIN" was "later" "discovered" after the high-risk stop.  That it was a "partial VIN" match was known to Duffield from the inception.

25. Toren's vehicle and the stolen vehicle were different in the following ways:

    a.  Make: Toren's vehicle is a Honda; the stolen vehicle was an Acura.

    b.  Model: Toren's vehicle is a Civic; the stolen vehicle was an Integra.

    c.  Body style: Toren's vehicle is a sedan; the stolen vehicle was a hatchback.

    d.  Color: Toren's vehicle is green; the stolen vehicle was black.

    e.  License state: Toren's vehicle has Utah license plates; the stolen vehicle had Washington license plates.

26. Despite the mismatch between Toren's car and the car referenced in the NCIC alert, Duffield announced that he was initiating a "felony" or "high risk" stop of Toren, P.B., Carli, and Michael.

27. This announcement caused other officers to travel to Duffield's location to assist him. Upon information and belief, the other officers assumed that Duffield had verified the car before announcing the felony stop.

28. There were no exigent circumstances that necessitated Duffield stopping the vehicle immediately, before taking time to verify that the vehicle matched the NCIC alert.

29. Duffield was charged with knowledge of, and had a duty to consider, all readily available exculpatory evidence, including the fact that the car described in the NCIC alert was not similar to the car Duffield was stopping at gunpoint.

30. Upon information and belief (derived from the unredacted portions of Lehi City officers' reports), Duffield brought his car to a complete stop and waited for backup before beginning the felony stop.  At no time while his vehicle was stopped did Duffield take any steps to compare the car he was stopping at gunpoint with the car referenced in the NCIC alert.

31. There were no indications at any time during the incident that any of the passengers were armed or dangerous.

32. Upon pulling over, Toren observed multiple Lehi police officers through his rear-view mirror. Several police officers were positioned behind their vehicles and pointing rifles and handguns at the occupants of Toren's vehicle.

33. Officers shouted for Toren ("Driver!") to exit his vehicle.

34. Toren and the other passengers began to panic, as they did not understand what was happening.

35. Passengers Michael Srygler and Carli Brady took out their cell phones and began to record the incident.

36. In response to commands, Toren exited his vehicle. [X60A6993S – 14:41:18][1]

37. None of the officers asked Toren whether he owned the vehicle or any other questions designed to clarify the situation.

38. With multiple officers pointing guns at him, Toren raised his hands and walked backward toward officers, as instructed. [X60A6993S – 14:41:18]

---

[1] The bracketed citations refer to bodycam identification numbers followed by timestamps from that bodycam.



39. As he was walking backwards toward officers, as instructed, Toren asked officers, "What am I being detained for?" [X60A6993S – 14:42:16]

40. Officers responded, "We will explain it to you. Just do as you're being told for a second." [X60A6993S – 14:42:20]

41. Toren complied with all of the officers' commands.

42. Toren stated that he owned the vehicle, and that his father, from whom he had purchased the vehicle, had owned it since at least 2011.  Toren offered to show the officers the car's registration.

43. Toren's then 6-year-old son, P.B., remained in the vehicle as Toren was separated from him.

44. Officers then called to passengers Michael Srygler and Carli Brady, "Passengers, step out. Keep your hands in the air. Face away from me. Walk backwards to the sound of my voice." [X60A6912X – 14:42:27]

45. Michael exited the front passenger seat next, responding "Yes, sir," to officers' commands. [X60A6912X – 14:42:30]



46. Officers ordered Michael to place his cell phone on the ground. [X60A6750T – 14:42:50]

47. Michael placed the cell phone on the ground.

48. Michael was then handcuffed by a Lehi officer.  Michael asked the officer holding him at gunpoint, "You're aiming your gun at a car with a child. Is that fun?" [X60A6750T – 14:43:30]

49. The officer (believed to be Sgt. Drew Olson) responded, "It is fun." [X60A6750T – 14:43:35]  The officer continued, "Shut the [expletive] up." [X60A6750T – 14:43:37]

50. Michael responded, "I don't have to. First Amendment. Are you going to strip my rights from me?" [X60A6750T – 14:43:42]

51. The officer then said, "You're detained, bro. I recommend your Fifth" (referring to the Fifth Amendment right to remain silent). [X60A6750T – 14:43:44]

52. As Michael was escorted to a police cruiser by another officer, an officer again told Michael to "Shut the [expletive] up." [X60A6750T – 14:43:48]

53. All the while, officers continued to point guns at the vehicle containing Carli and P.B. from their positions behind their police vehicles.



54. Officers then instructed Carli to step out of the car, put her hands up, and walk backwards toward them. [X60A6750T – 14:44:17]

55. Carli exited the vehicle at gunpoint. She had to climb out of the back seat, from her position in the car next to P.B., and through a front door because the child locks on the car were engaged.

56. As Carli exited the vehicle, she was holding her cell phone on which she was attempting to document the incident.

57. P.B. was now alone in the car. He was terrified.



58. Officers ordered Carli to "Put your phone down" [X60A6750T – 14:44:35]  and to put her phone on Toren's vehicle before walking backward toward the police.  Carli placed her cell phone on Toren's car.

59. As Carli arrived (walking backward) at the officers' location, an officer stated, "You're just being detained. Do you understand that?" [X60A6750T – 14:45:17]

60. Carli responded, "I don't understand why." [X60A6750T – 14:45:18]

61. Toren, Michael, and Carli all repeatedly told officers there was a child in the vehicle.

62. Toren, Michael, and Carli were each handcuffed and placed in the backs of separate police cruisers.

63. There were no handles on the interior of the doors of these police vehicles.   There was no way for Toren, Michael, and Carli to leave voluntarily.

64. With guns trained on the vehicle containing P.B., officers approached the vehicle to make contact with 6-year-old P.B. [X60A6130V – 14:45:48]



65. Upon arriving next to the vehicle, the officers looked into the vehicle through the rear driver's side window.  At that point, the officers lowered their guns. [X60A6130V – 14:45:59]

66. P.B. was upset and crying. After escorting P.B. from Toren's car, officers pulled Toren from the back of a police car, still in handcuffs, so he could talk to P.B. and try to calm P.B. down. [X60A6993S – 14:46:56]



67. P.B. continued to cry, and Toren lowered himself to his knees (still handcuffed).[2]

68. P.B. ran over and threw his arms around Toren, sobbing.  As P.B. clung to him, Toren tried to reassure his son, "It's just a confusion. It's OK. Daddy didn't do anything wrong, 'kay? I'm not going to jail or anything.  It's OK."

69. At this point, an officer is heard to ask, "You run the VIN yet?" [X60A6130V – 14:46:44] (The identities of the officers speaking cannot be determined from the video footage, and officers refused to provide names and badge numbers to the Plaintiffs when asked. [X60A6361Z – 14:57:00])

70. An officer responded, "No, not yet. I'll go run it real quick." [X60A6130V – 14:46:45]

---

[2] Duffield falsely stated in his report that, after P.B. was removed from the vehicle, "Toren, the child's father, was then taken out of handcuffs so that he could hold his child."  As shown in the photos, Toren remained handcuffed and was unable to hold P.B.

71. As officers continued to speak to one another, they muted their bodycam audio.

72. Subsequent to this point, the officers opened the back doors of the three vehicles and allowed the Plaintiffs to exit. The officers removed the handcuffs.

73. Upon information and belief, one or more of the other officers learned what Duffield already knew (and what dispatch had attempted to point out early in the stop): that Toren's car did not match the "stolen car" identified in the NCIC alert.

74.  After being released, Michael told officers, "If somebody pointed a gun at you, you'd probably react by shooting them, while I just have to take it because I don't get a badge. I get it." [X60A6361Z – 14:56:03]

75. A Lehi City officer responded, "Or it's because you're in a stolen car." [X60A6361Z – 14:56:08]

76. Michael responded, "Is it stolen?" [X60A6361Z – 14:56: 11].

77. Michael then asked, "Can I get names and badge numbers?" [X60A6361Z – 14:57:00]

78. In response, officers said no. [X60A6361Z – 14:57:03]

79. Shortly thereafter, Michael expressed his dissatisfaction, and an officer told him, "You're free to leave. You've been free to leave this whole time." [X60A6361Z – 14:58:20]

80. Michael replied, "Since the cuffs have been off?" [X60A6361Z – 14:58:23]

81. The officer confirmed, "Since the cuffs have been off." [X60A6361Z – 14:58:24]

82. The Plaintiffs were held, at gunpoint and/or in handcuffs, for approximately 15 minutes.

83. During the stop, Lehi City officers blocked traffic on the public roadway for several minutes.



84. After the events, Lehi City Police Sgt. Drew Olson falsely attempted to blame "DMV" (Department of Motor Vehicles) for the incident.[3]  Olson knew that Duffield had ignored the information conveyed from NCIC, and that Duffield had not verified that the car he was pulling over was the subject of the NCIC report.

85. Sgt. Olson also attempted to blame "dispatch" for the stop, writing in his supplemental report, "The [dispatch] supervisor stated she would have a discussion with the dispatcher and take care of the mistake on their end. I advised that I would speak with my officers about trying to glance quickly at the *[redacted by Lehi]* listing prior to conducting a

---

[3] In his police report supplement, Olson wrote that, during his discussion of the stop with Toren Beales, he "asked Toren how [officers] would know that his case is the once exception [*sic*] of a possible mistake from the DMV, when that rarely happens, and furthermore, I asked him how often he thought that happens on cases like this."

stop. It should be noted that it is not very conducive most of the time, while driving."  Olson knew that "dispatch" had initially relied on the incomplete information provided by Duffield and had later made efforts to affirmatively point out the obvious, that the NCIC alert was for a completely different car.

### *Aftermath of the Traffic Stop*

86. Following the high-risk traffic stop, passenger Michael Srygler published his cell phone videos to one or more online outlets.

87. Multiple local media outlets, including KUTV, KSL News, Gephardt Daily News, and KJZZ published articles about the incident.[4]


UTAH

# Lehi police officer initiated a felony stop on incorrect information

Apr 10, 2023, 4:00 PM

---

[4] https://kslnewsradio.com/1998575/lehi-police-officer-initiated-a-felony-stop-on-incorrect-information/ ;
https://kutv.com/news/local/officials-address-lehi-couple-child-forced-to-endure-wrongly-conducted-armed-high-risk-traffic-stop-lehi-city-police-department;
https://kutv.com/news/2news-investigates/wrongful-police-stop-in-lehi-leads-to-three-citizens-fearing-for-their-safety-running-license-plate-stolen-car-guns-drawn-law-enforcement-traffic-noise-child-inside ;
https://gephardtdaily.com/local/lehi-police-chief-issues-statement-after-officers-draw-guns-perform-high-risk-stop-on-vehicle-wrongly-believed-stolen/ ;
https://kjzz.com/news/local/wrongful-police-stop-in-lehi-leads-to-three-citizens-fearing-for-their-safety-running-license-plate-stolen-car-guns-drawn-law-enforcement-traffic-noise-child-inside



88. Within days of the incident, Michael Srygler submitted GRAMA requests to Lehi City, directing Lehi City to preserve documents, including any ALPR records, relating to the stop.

89. On or about April 12, 2023, Lehi police chief Darren Paul released a statement regarding the incident. Chief Paul's statement ratified the actions of Duffield and the others involved in the stop. Chief Paul stated that the officers' actions were consistent with "training" and "Lehi City Police Department policies and procedures".

90. All of the Plaintiffs experienced significant distress and fright. P.B. continues to experience substantial anxiety from the incident, especially when he sees a law enforcement officer and when riding as a passenger with his father.

91. Plaintiffs have had to retain experienced civil rights counsel in order to vindicate their rights.

## FIRST CLAIM FOR RELIEF

### *Initial Stop*

### *(Fourth Amendment and Utah Constitution Art. I, § 14)*

92. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

93. At all times relevant hereto, Plaintiffs had a right to be free of unreasonable stops, searches, seizures, and detentions, under the Fourth Amendment to the U.S. Constitution, and Article I, § 14 of the Utah Constitution.

94. At all times relevant hereto, and in performance of the acts set forth herein, Defendants Lehi City and Duffield acted under color of state law.

95. At all times relevant hereto, and in performance of the acts set forth herein, Defendants Lehi City and Duffield actively and personally caused the violations of constitutional rights alleged herein.

96. Defendants Lehi City's and Duffield's conduct alleged herein—including an unreasonable stop, undertaken without reasonable suspicion—violated Plaintiffs' rights under the Fourth Amendment to the U.S. Constitution as well as Article I, § 14 of the Utah Constitution.

97. The unlawful misconduct of Defendant was objectively unreasonable and undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

98. Duffield's actions violated Plaintiffs' clearly established constitutional rights of which reasonable police officers are or should be aware.

99. Duffield's actions were consistent with Lehi City policies and procedures, training, and have been ratified by Lehi City.

100. Defendants' unlawful actions caused Plaintiffs to incur damages and out of pocket expenses, which Plaintiffs are entitled to recover herein.

101. Plaintiffs are further entitled to attorney fees and expenses pursuant to 42 U.S.C. § 1988, pre-judgment interest, and costs as allowable by federal law.

**SECOND CLAIM FOR RELIEF**

*Arrest*

*(Fourth Amendment and Utah Constitution Art. I, § 14)*

102. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

103. At all times relevant hereto, Plaintiffs had a right to be free of unreasonable stops, searches, seizures, and detentions, under the Fourth Amendment to the U.S. Constitution, and Article I, § 14 of the Utah Constitution.

104. At all times relevant hereto, and in performance of the acts set forth herein, Defendants Lehi City and Duffield acted under color of state law.

105. At all times relevant hereto, and in performance of the acts set forth herein, Defendants Lehi City and Duffield actively and personally caused the violations of constitutional rights alleged herein.

106. Defendants Lehi City's and Duffield conduct alleged herein—including Plaintiffs' *de facto* arrest enacted by Lehi City and Duffield—violated Plaintiffs' rights under the Fourth Amendment to the U.S. Constitution as well as Article I, § 14 of the Utah Constitution.

107. During the arrest and surrounding process, Duffield and the other officers yet to be identified used an unnecessary and unreasonable degree of force. The force included having guns pointed directly at the Plaintiffs rather than in ready position; having guns pointed at Plaintiffs when they were compliant, not reasonably suspected of being armed or dangerous, and had been subdued; having guns pointed at P.B. when he was alone in the car, despite knowing that P.B. was a young child; and being locked in separate police cars.

108. The unlawful misconduct of Defendant was objectively unreasonable and undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

109. Defendant Duffield's actions violated Plaintiffs' clearly established constitutional rights of which reasonable police officers are or should be aware.

110. Duffield's actions were consistent with Lehi City policies and procedures, training, and have been ratified by Lehi City.

111. Defendants' unlawful actions caused Plaintiffs to incur damages and out of pocket expenses, which Plaintiffs are entitled to recover herein.

112. Plaintiffs are further entitled to attorney fees and expenses pursuant to 42 U.S.C. § 1988, pre-judgment interest, and costs as allowable by federal law.

## THIRD CLAIM FOR RELIEF

*(First Amendment and Utah Constitution Art. I, §§ 1, 15)*

113. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

114. At all times relevant hereto, and in performance of the acts set forth herein, Defendant Lehi City and its officers acted under color of state law.

115. At all times relevant hereto, Plaintiffs had a right to freely express their thoughts and opinions under the First Amendment to the U.S. Constitution and Article I, §§ 1 and 15 of the Utah Constitution.  Plaintiffs' rights included documenting public police interactions.

116. At all times relevant hereto, and in performance of the acts set forth herein, Defendant Lehi City and its officers actively and personally caused the violations of constitutional rights alleged herein.

117. According to the Lehi police officers on scene, Plaintiffs Michael Srygler and Carli Brady had not been arrested, but merely "detained."

118. Defendant Lehi PD's and its officers' conduct alleged herein—including requiring Plaintiffs Srygler and Brady to relinquish their cell phones, which were recording the incident, while claiming Plaintiffs were not under arrest—violated Plaintiffs' rights under the First Amendment to the U.S. Constitution and Art. I, §§ 1 and 15 of the Utah Constitution.

119. The unlawful misconduct of Defendant was objectively unreasonable and undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

120. The actions of the officers who required Srygler and Brady to stop filming were consistent with Lehi City policies and procedures, training, and have been ratified by Lehi City.

121. Defendant Lehi City's and its officers' actions violated Plaintiffs' clearly established constitutional rights of which reasonable police officers are or should be aware.

122. Plaintiffs are entitled to attorney fees and expenses pursuant to 42 U.S.C. § 1988, pre-judgment interest, and costs as allowable by federal law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the entry of a judgment in their favor and against Defendants as follows:

1. A declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that Defendants' actions violated Plaintiffs' rights under the Fourth Amendment to the U.S. Constitution as well as Article I, §14 of the Utah Constitution.

2. A declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that Defendants' actions violated Plaintiffs Michael Srygler's and Carli Brady's rights under the First Amendment to the U.S. Constitution as well as Article I, §§ 1, 15 of the Utah Constitution.

3. A judgment awarding Plaintiffs interest on economic losses to the extent permitted by law.

4. A judgment awarding compensation to Plaintiffs for their noneconomic loss, emotional distress and other personal injury resulting from the violation of their Constitutional rights.

5. A judgment awarding Plaintiffs their costs of suit, including reasonable attorney fees and litigation expenses, under 42 U.S.C. § 1988.

6. A judgment awarding such other and further relief, including equitable, declaratory, and injunctive relief, to which Plaintiffs may be entitled.

DATED this 19th day of December, 2023.

CHRISTENSEN & JENSEN, P.C.


*/s/ Karra J. Porter*
Karra J. Porter
M. Tanner Clagett
*Attorney for Plaintiffs Toren Beales, Carli Brady and Michael Srygler*


JURY TRIAL DEMANDED
Plaintiff requests a jury trial on all issues triable under the
Utah and United States constitutions.